UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

CASE NO. 5:14-cv-661-Oc-10PRL

DUSTIN HEATHMAN,

     Plaintiff,

vs.

CHRIS BLAIR, THOMAS BIBB,
MICHAEL DODD, RYAN ROBBINS,
CODY HOPPEL, ROY HAY, GREG
BICKSLER, JEFFREY BOYLES and
MARION COUNTY SHERIFF'S
OFFICE,

     Defendants.

_____/

## MOTION FOR SUMMARY JUDGMENT
## OF DEFENDANTS SHERIFF, BIBB, DODD, ROBBINS, AND BICKSLER,
## AND MEMORANDUM OF LAW

     COME NOW the Defendants, Chris Blair, as Sheriff of Marion County, Florida, and

Thomas Bibb, Michael Dodd, Ryan Robbins, and Greg Bicksler, in their individual capacity,

by and through their undersigned attorneys, pursuant to Federal Rule of Civil Procedure 56,

and each moves the Court for an order of summary judgment in his favor and against the

Plaintiff, Dustin Heathman, and says:

1.     The Plaintiff filed his verified pro se Complaint on November 26, 2014,[1] to which

these Defendants filed an Amended Answer on March 11, 2015, asserting various affirmative

---

[1] On the same day, the Plaintiff filed another case in the Middle District regarding conditions of confinement at the jail. (Case No. 5:14-cv-662.) It was dismissed by the court and Heathman's appeal of that order is pending before the Eleventh Circuit Court of Appeals. (Case No. 15-15450.)

defenses.[2] (Doc. 1; Doc. 24.) On May 14, 2015, the Court granted the Plaintiff's February 19,

2015, motion to amend his Complaint by adding two additional exhibits. (Doc. 21; Doc. 27.)

The exhibits were a newspaper article and a declaration signed by Jennifer R. Brown. (Doc.

21, p. 3-4.) The May 14 order also set discovery cutoff on August 7, 2015. (Doc. 27, p. 1.)

On February 22, 2016, a Notice of Appearance on the Plaintiff's behalf was filed by Aaron

V. Johnson, Esquire, and the firm of Collins, Brown, Barkett, Garavaglia & Lawn, Chartered.

(Doc. 57.)

2.      The Complaint, brought pursuant to 42 U.S.C. § 1983, sues the Sheriff of Marion

County and seven deputies, all in their individual and official capacity. Claims against the

deputies in their official capacity should be dismissed as such a claim is made against the

governmental entity by which they are employed.  See Kentucky v. Graham, 473 U.S. 159,

165-66, 105 S. Ct. 3099, 3105 (1985). The Complaint also names the Marion County

Sheriff's Office as a defendant, which is improper and should be stricken. See Dean v.

Barber, 951 F.2d 1210, 1214-15 (11th Cir. 1992). Also stricken should be the improper

punitive damages claim against the Sheriff in his official capacity. See Graham, 473 U.S. at

167 n.13; 105 S. Ct. at 3106 n.13; Colvin v. McDougall, 62 F.3d 1316, 1319 (11th Cir. 1995).

3.      The Complaint is made regarding the Plaintiff's arrest on June 1, 2014, in Marion

County. It alleges that after a six hour "standoff ending in no injuries," he surrendered and

laid on the ground. He alleges that he followed the deputies' orders, and was handcuffed. The

Complaint alleges that "almost simultaneously" he was struck, causing him to fall, and he

---

[2] At the time of the Amended Answer and the affirmative defenses, the below-signed counsel
also represented the Defendants Roy Hay and Jeffrey Boyles. Since then, these deputies have
obtained other counsel. (Doc. 42; Doc. 43; Doc. 44.)

was then repeatedly struck. He states he was thrown into the armored vehicle present on the scene, and then a deputy bounced his knee on the Plaintiff's head. (Doc. 1.) Exhibits attached to the Complaint include a letter from the Plaintiff to Florida Attorney General Pam Bondi; a September 23, 2014, letter from Florida Attorney General Pam Bondi; two Inmate Request Forms from the Marion County Jail; a September 16, 2014, letter from an official at the Florida Department of Law Enforcement; an Inmate Medical Request Form from the Marion County Jail; and seven photographs of the Plaintiff. (Doc. 1, p. 13-24.) Previously filed with the Court by the parties are (1) a copy of the Plaintiff's July 21, 2015, deposition transcript (Doc. 61-1), and (2) the Plaintiff's undated Declaration (Doc. 65-1).

4.      The claims against each Defendant are not clearly delineated. The Plaintiff alleges generally that some members of the SWAT team used excessive force in his arrest and other Sheriff's Office personnel present failed to intervene. In some of the allegations, he does use names of specific Defendants. The Complaint states that "due to the amount of head gear, glasses and the attack itself, Plaintiff can't identify which defendants actually struck him." He states that Defendants Robbins, Hoppel, Hay, Boyles, and Bicksler were assigned to the BearCat armored vehicle, and that they "were [all] present during the beating and did nothing to stop it." He also states that the Sheriff, "Major, and Detective" were present and failed to protect. Presumably, this refers to Major Bibb and Detective Dodd. However, the Complaint then says that "during interrogation" Major Bibb and Det. Dodd were "informed by Plaintiff as to the beating," and "they did nothing to investigate and/or reprimand the SWAT operators." Regarding the Sheriff, he alleges the Sheriff came and looked at him when he

was in the police cruiser at the scene. (Doc. 1.) No policy or custom allegations regarding the Sheriff's Office are made in the Complaint, but such a claim will be addressed.

5.      In addition to monetary damages, the Complaint seeks the following injunctive relief: (1) orders by the Sheriff to prevent and cease any intimidation or harassment of the Plaintiff, and (2) a new Sheriff's Office policy forcing SWAT officers to wear body or helmet cameras. (Doc. 1, p. 9-10.) The Complaint fails to state any of the elements of injunctive relief.  Siegel v. LePore, 234 F.3d 1163, 1176 (11th Cir. 2000 (en banc). Among the elements is that the plaintiff will suffer irreparable injury unless the request is granted. Id. The requests are moot as to the Plaintiff and should be stricken. He is now incarcerated, according to the website of the Florida Department of Corrections, at the Lake Butler Reception and Medical Center.

6.      Heathman was convicted at trial on December 22, 2015, of one count of Attempted Second Degree Murder of Law Enforcement Officer with a Firearm, five counts of Aggravated Assault of Law Enforcement Officer with a Firearm, and one count of Firing Into a Vehicle, and was sentenced to life in prison. (Composite Exhibit 1: copies of pleadings from Marion County Circuit Court, Case No. 14-CF-1947.)[3] Heathman did not testify at his criminal trial. Deputy Bicksler and Det. Dodd were called as witnesses.

7.      In another case, United States vs. Hoppel, United States District Court, Middle District of Florida, Case No. 5:15-CF-53, the defendant, Cody Hoppel, entered a plea of

---

[3] Copies of court documents would be admissible at trial as public records. Fed. R. Evid. 901(b)(7). Sheriff's Office documents produced in the regular course of business, such as an arrest affidavit and incident reports would be admissible as business records. See Pt Indonesia Epson Ind. v. Orient Overseas Container Line, Inc., 219 F. Supp. 2d 1265,1274 n.8 (S.D. Fla. 2002).

guilty to using unreasonable force in the arrest of Heathman and in another, unrelated, arrest. On October 27, 2015, he entered into a plea agreement in which he agreed to statements regarding some circumstances of Heathman's June 1, 2014, arrest. In the Plaintiff's response to a Motion for Summary Judgment by Defendant Hay in the instant case, he filed the plea agreement and asserted that it establishes as a fact that unreasonable force was used on Heathman. (Doc. 70, p. 6; Doc. 70-1, p. 19-20.) This is incorrect; neither the doctrine of res judicata nor collateral estoppel applies to import the plea agreement contents into this case.

The res judicata doctrine states that a final judgment bars a subsequent claim based on matters litigated or that could have been litigated in the first suit. See I.A. Durbin, Inc. v. Jefferson Nat'l Bank, 793 F.2d 1541, 1549 (11th Cir. 1986) (citing Migra v. Warren City School District Bd. of Educ., 465 U.S. 75, 77 n.1, 104 S. Ct. 892, 894 n.1 (1984)). One of the elements for the application of res judicata is that the parties, or those in privity with them, must be identical in both suits. Id. at 1549. That requirement is not met in this case. See Rivers v. Diaz, 2008 U.S. Dist. LEXIS 937, *6 (M.D. Fla. Jan. 7, 2008).

Collateral estoppel refers to the effect of a judgment in foreclosing relitigation of an issue of fact or law litigated in a prior suit. See id. The plea agreement in the federal criminal case, in which none of the civil case Defendants except Hoppel were involved, is not available to decide an issue of fact against them. The identities of the parties or their privies are not identical, and the statements in the plea agreement do not preclude the Defendants from re-litigating any of the issues resolved in Heathman's favor in the criminal case. See id.

at *7-8.[4] In addition, the Court should not use the plea agreement to establish the truth of the matters Heathman asserts. Id. at *8 (citing U.S. v. Jones, 29 F.3d 1549, 1553-54 (11th Cir. 1994)). The plea agreement in Defendant Hoppel's criminal case (Doc. 70-1) should be stricken by the Court. See id. at *9 (striking federal criminal case orders filed as evidence in civil case.)

8.      As discussed below, the Defendants Dodd and Bibbs did not arrive until the Plaintiff was already in custody. They were at the Mobile Command Center where they conducted the post-arrest follow-up. Likewise, Sheriff Blair was not present at the Plaintiff's arrest. The Defendants Bicksler and Robbins did not participate in any force against the Plaintiff, who was shooting at them during the incident, nor did they observe any use of force so that they had an opportunity to intervene if warranted. Each Defendant is entitled to qualified immunity as none violated the Plaintiff's constitutional rights. The Sheriff's Office had a Use of Force policy in effect, which is provided with the Sheriff's affidavit, attached as Exhibit 2, and there is no evidence of a widespread, pervasive practice of incidents similar to this in which excessive force was used.

THEREFORE, the Sheriff and Deputies Bicksler, Dodd, Bibb, and Robbins request the entry of summary judgment in their favor and against the Plaintiff.

---

[4] In Rivers, the federal court suppressed evidence in a criminal case and made negative comments about the reliability and credibility of the arresting officers pertaining to the traffic stop and search of the criminal defendant. The defendant filed a civil suit against the officers alleging he was stopped and searched without probable cause and filed the criminal case orders as evidence.

## MEMORANDUM OF LAW

## I. SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the court is satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." In making this determination, the court must view the evidence in the light most favorable to the non-moving party. Samples on behalf of Samples v. Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988). The initial burden of establishing the absence of a genuine issue of material fact rests on the moving party. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986). Once the moving party meets the initial burden, the non-moving party "bears the burden of coming forward with sufficient evidence of every element that he or she must prove." Rollins v. TechSouth, Inc., 833 F.2d 1525, 1528 (11th Cir. 1987). In order to meet this burden, the non-moving party "must go beyond the pleadings" and establish "specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324, 106 S. Ct. at 2553. The mere existence of an alleged factual dispute between the parties will not defeat a properly supported motion for summary judgment; there must be a genuine issue of a material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505 (1986) (emphasis in original).

## II. QUALIFIED IMMUNITY

"[Q]ualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002). A two-part framework is used to evaluate qualified

immunity defenses. One inquiry of the analysis is whether the plaintiff's allegations, if true, establish a constitutional violation. Hope v. Pelzer, 536 U.S. 730, 736, 122 S. Ct. 2508, 2513 (2002) (citing Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156 (2001)). If the facts, construed in the light most favorable to the plaintiff, show that a constitutional right has been violated, another inquiry is whether the right violated was "clearly established." Saucier, 533 U.S. at 201, 121 S. Ct. at 2156. Apprehending a suspect and making an arrest are within the discretionary duties of law enforcement officers. See Crosby v. Monroe County, 394 F.3d 1328, 1332 (11th Cir. 2004). Thus, the burden of proof is upon the Plaintiff to establish that qualified immunity is not appropriate. Vinyard, 311 F.3d at 1346.

Furthermore, the knowledge and actions of each Defendant must be considered on an individual basis. See Burnette v. Taylor, 533 F.3d 1325, 1331 (11th Cir. 2008) (imputed or collective knowledge is not enough; defendant must be judged on what he himself knew) (emphasis supplied). The Plaintiff must show that each Defendant, through his own actions, violated the Constitution. See Keating v. City of Miami, 598 F.3d 753, 766 (11th Cir. 2010).

### III. MONELL CLAIM AGAINST THE SHERIFF

To establish liability against the Sheriff in his official capacity, the Plaintiff must provide evidence of a policy, custom, practice, or procedure that provided the moving force behind the alleged constitutional violation. See Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 694-95, 98 S. Ct. 2018, 2037-38 (1978). A governmental entity is not liable for its employees' actions under § 1983 based on the theories of respondeat superior or vicarious liability. See Belcher v. City of Foley, 30 F.3d 1390, 1396 (11th Cir. 1994). A governmental entity cannot be held liable solely because it employs a tortfeasor. Monell, 436

U.S. at 691, 98 S. Ct. at 2036. To establish the existence of a custom, a persistent and widespread practice must generally be shown. McDowell v. Brown, 392 F.3d 1283, 1290 (11th Cir. 2004). Normally, random acts or isolated incidents will not suffice. Id. (citations omitted).

The Sheriff's Office had in effect on the arrest date Operations Directive 4030.00— Use of Force. (Sheriff affidavit, Exh. A.) This policy states that officers are to use only that degree of force necessary to perform their official duties. They shall not strike or use physical force against any person except when necessary in the performance of those duties. The Operations Directive provides a framework for the deputies' decision-making that is based on the Florida Department of Law Enforcement Force Guidelines. This policy was not the moving force behind any alleged use of excessive force and violation of the Plaintiff's rights.

In addition, there is no evidence of a widespread use of excessive force by deputies of which the Sheriff should have been aware that called for a policy to prevent constitutional violations to which he was deliberately indifferent. See Depew v. City of St. Mary's, Ga., 787 F.2d 1496, 1499 (11th Cir. 1986); McDowell, 392 F.3d at 1290. To impose liability on a governmental entity based on a failure to act, the plaintiff must show the "policy of inaction" is the functional equivalent of a decision to violate the Constitution. City of Canton v. Harris, 489 U.S. 378, 394-95, 109 S. Ct. 1197, 1208 (1989) (O'Connor, J., concurring in part and dissenting in part). The only evidence of another use of excessive force is the other arrest to which Hoppel admitted in his criminal case regarding the incident unconnected to Heathman. That one incident is insufficient to establish a pervasive practice of the use of excessive force. Furthermore, it occurred on August 7, 2014, subsequent to Heathman's arrest, so could

not have put the Sheriff on notice of the need for a training policy in that area. (Doc. 70-1, p. 17-20.) See Wright v. Sheppard, 919 F.2d 665, 674 (11th Cir. 1990) (a need for specific training is not obvious unless there is evidence of a history of widespread abuse) (emphasis supplied).  There is no genuine issue of material fact that no policy or custom of the Sheriff's Office caused a violation of the Plaintiff's rights, and the Sheriff should be granted summary judgment in his official capacity.

### IV. CLAIMS FOR FAILURE TO INVESTIGATE OR TO FILE A REPORT

It is unclear against which Defendants the Plaintiff is bringing claims of failure to investigate and failure to file a report. However, such actions, even if true, which the Defendants are not conceding, do not rise to the level of a constitutional violation. This assertion is akin to a due process claim, but there is no constitutionally-protected liberty or property interest that an investigation or a report be produced by the agency.  See Stringer v. Doe, 2011 U.S. Dist. LEXIS 77639, *23 (N.D. Fla. June 16, 2011) (no substantive due process right to investigation) (citing Vinyard, 311 F.3d at 1356 (no constitutional right to internal investigation of excessive force claim)); Flores v. Satz, 137 F.3d 1275, 1278 n.7 (11th Cir. 1998)), adopted, 2011 U.S. Dist. LEXIS 77636 (N.D. Fla. July 18, 2011); see also Williams v. Glover, 2015 U.S. Dist. LEXIS 174738, *4-5 (M.D. Ga. Dec. 8, 2015) (violation of prison rule requiring a report is not a constitutional claim) (citing Sandlin v. Conner, 515 U.S. 472, 481-82, 115 S. Ct. 2293 (1995).

Clearly, the level of investigation and the alleged lack of a "report" did not deny Heathman access to the courts, as he filed his Complaint within six months of the incident. If his claim regarding the filing of a report is intended to allege failure to meet a procedural

requirement for an investigating officer, that is not a basis for a § 1983 claim. <u>See</u> <u>Austin v. City of Montgomery</u>, 353 Fed. Appx. 188, 191 (11th Cir. Nov. 16, 2009) (violation of state statute does not create a liberty or property interest and is not a basis for due process claim). All the Defendants should be granted summary judgment on these claims.

If a ratification claim against the Sheriff in his official capacity is intended, it fails because, assuming <u>arguendo</u> that excessive force was used and was not investigated, neither of which is being conceded, the failure to investigate a single incident, of which the Sheriff was unaware until after-the-fact, cannot ratify a constitutional violation. <u>Salvato v.  Miley</u>, 790 F.3d 1286, 1295 (11th Cir. 2015). The lack of investigation could not have caused a violation of the Plaintiff's rights. <u>See</u> <u>Garvie v. City of Ft. Walton Beach</u>, 366 F.3d 1186, 1189 (11th Cir. 2004) (for successful ratification claim, plaintiff must show policymaker had opportunity to review subordinate's decision and agreed with the decision and its basis); <u>Feliciano v. City of Miami Beach</u>, 847 F. Supp. 2d 1359, 1366 (S.D. Fla. 2012) (inadequate investigation could not be legal cause of plaintiff's injury and did not establish a city policy), <u>aff'd on other grounds</u>, 707 F.3d 1244 (11th Cir. 2013). The Sheriff would be entitled to summary judgment on this claim.

## V. CLAIMS AGAINST DODD AND BIBB

Since the Plaintiff's claims are undifferentiated, it is assumed that the remaining claims against each of these Defendants, including Major Bibb and Det. Dodd, are use of excessive force and failure to intervene. The Complaint states that "during interrogation" he "<u>informed</u> [Dodd and Bibb] as to the beating and the condition of his face." (Doc. 1, p. 9.) Clearly, they were not present during his arrest when any of the alleged excessive force

occurred. Det. Dodd's affidavit and the trial transcript ("TT") excerpt of his testimony are attached as Exhibits 3 and 4, respectively. The transcript of his deposition in Heathman's criminal case is attached as Exhibit 5. As the affidavit states and as he testified at trial, when he arrived, Heathman was already in custody; the action had happened before he got there. (Dodd affidavit; TT, p. 738-739.) He, along with Major Bibb, interviewed Heathman at the Mobile Command Center, and that was the extent of his contact with him. (Dodd affidavit; TT, p. 749, 753; Dodd depo, p. 15.)

Det. Dodd testified in his deposition that he got to the Mobile Command Center about an hour after the incident. He prepared the Arrest Affidavit based on information received from other officers. This was pursuant to the Fellow Officer Rule, which is that testimony and observations from other officers are valid and can be used to complete reports and probable cause affidavits if necessary. (Dodd depo, p. 12-14.) He also prepared a Supplemental Incident Report and both documents are attached to his affidavit. The Plaintiff testified in his deposition that he saw Det. Dodd at the Mobile Command Center where he was interviewed after the incident. Det. Dodd did not do anything physically improper to him, but he thought the deputy should have done an investigation or a report. (Doc. 61-1, p. 70, 79.) Any excessive force claim against Det. Dodd fails, as well as a failure to intervene claim, as he was not present during the incident. Det. Dodd did not violate the Plaintiff's constitutional rights, and the deputy is entitled to a summary judgment.

This is also true for Major Bibb, whose affidavit is attached as Exhibit 6. An attachment to the affidavit is his Supplemental Incident Report. He states in the affidavit that he has no personal knowledge of what occurred during Heathman's arrest. He went to the

Mobile Command Center and Heathman was in custody and in the rear seat of a patrol vehicle. He ordered Heathman brought to the command center, where he was questioned. (Bibb affidavit.) Heathman testified that Major Bibb was one of the people who interviewed him after he was brought to the command center. Again, his complaint is that he does not think the deputy did a proper investigation and report. The major did not do anything physically improper to him.  (Doc. 61-1, p. 70, 78, 84.) Any excessive force or failure to intervene claim against Major Bibb fails, as he was not present during the incident. The major did not violate the Plaintiff's constitutional rights, and he is entitled to a summary judgment.

## VI. CLAIMS AGAINST SHERIFF BLAIR

The Plaintiff's pro se Complaint is unclear regarding the claims he seeks to make against Sheriff Blair. (Doc. 1, p. 8-9.) It states that when he was "attacked," the Sheriff, Major Bibb, and Det. Dodd were "all present" and "failed to protect or even investigate." As discussed, Major Bibb and Det. Dodd did not see the Plaintiff until after the incident and he is not alleging otherwise. Presumably, when he says the three were "present," he does not mean actually during the alleged attack. This is borne out by his deposition testimony, in which he states that after he was taken into custody and driven in the BearCat and placed in a patrol vehicle, the Sheriff came to the car window and looked in at him. (Doc. 1, p. 9; Doc. 61-1, p. 70, 83-84.) He never testified that the Sheriff was present at the incident location.

The Sheriff testifies in his affidavit that during the incident he was located at the Mobile Command Center, he never went to the incident's location, and he did not observe Heathman's arrest. While he was in the area of the command center, he saw deputies getting

someone out of the back of a patrol car, and paramedics were there also. He only glimpsed the back of the person, but he assumed it was Heathman. The Sheriff was not in close proximity to the Plaintiff and had no physical or verbal contact with him. (Exh. 2: Sheriff affidavit.) No evidence supports that Sheriff Blair observed the Plaintiff being taken into custody at the scene and, if failure to intervene was an intended claim, the Sheriff should be granted summary judgment.

Heathman's other allegation against the Sheriff is that he "looked in [the Plaintiff's] eye and pointed in a pistol fashion, pulled the imaginary trigger, smiled, winked, and walked away." The Sheriff's affidavit negates this allegation. However, even if such an event had occurred, it is not a constitutional violation. See McFadden v. Lucas, 713 F.2d 143, 146 (5th Cir. 1983) (threatening language and gestures do not amount to constitutional violations), cert. denied, 464 U.S. 998, 104 S. Ct. 499 (1983). There is no genuine issue of material fact that the Sheriff did not violate Heathman's constitutional rights and he should be granted summary judgment on any claims brought against him in his individual capacity.

## VII. CLAIMS AGAINST BICKSLER AND ROBBINS

Deputy Bicksler and Sgt. Robbins are the only ones of these five Defendants who were present at the scene of the June 1, 2014, incident with the Plaintiff. Deputy Bicksler's affidavit, his trial testimony, and his deposition in Heathman's criminal case, are attached as Exhibits 7, 8, and 9, respectively. Sgt. Robbins' affidavit is Exhibit 10 and his deposition transcript is Exhibit 11; he was not called to testify at Heathman's criminal trial.

## A. DEPUTY BICKSLER: NO EXCESSIVE FORCE CLAIM

On June 1, 2014, Deputy Bicksler worked in the road patrol; he was a support person for the SWAT team because he is a paramedic. As a paramedic support person, he did not get all the training that the SWAT team does. He was contacted at home and told to bring the BearCat, an armored vehicle, to the address where a subject was barricaded. There were two command posts set up at the incident. One was the Tactical Command Post, which was on the edge of the property where the house was located in which the subject was barricaded. The other was the Mobile Command Center, which was located some distance from the property at the intersection of two streets. Sgt. Donnie Medlin, who was managing the operation, was at the Tactical Command Post. (Bicksler affidavit; TT, p. 209-210, 212-213; Bicksler depo, p. 3-4, 6-9.)

Deputy Bicksler stopped first at the Mobile Command Center and Sgt. Robbins, along with Deputies Hay, Boyles, and Hoppel got in the vehicle. He was the driver and never got out of the driver's seat. Robbins was in the front passenger seat, and the other three were in the back on bench seats. Pursuant to instructions from Sgt. Medlin, he stopped the BearCat about 25-30 yards from the house in which Heathman was barricaded. (Bicksler affidavit; TT, p. 209-210, 212-214; Bicksler depo, p. 3-4, 6-9.)

The BearCat was angled so they had a good view of the front of the house out the front windshield because visibility out the side windows is not good. After a while, a white female came out of the house and surrendered. She was searched for weapons and then they drove her to the Tactical Command Post. They then returned in the BearCat to about the same location. They were informed that tear gas was going to be deployed in about ten

minutes and they put on gas masks to protect themselves. (Bicksler affidavit; TT, p. 215-216; Bicksler depo, p. 10-16.)

At about the ten minute mark, a volley of gunfire came from the house. Deputy Bicksler later learned that Heathman was firing on them with an AK-47 rifle using 7.65 rounds. He does not know how many rounds hit the BearCat, but three rounds hit his half of the front windshield and at least one round hit the windshield in front of Sgt. Robbins. The body of the BearCat was also receiving gunfire strikes. The windshield had extensive damage and broke into eggshell cracks because the bullets were penetrating deep into the glass. (Bicksler affidavit; TT, p. 216-217; Bicksler depo, p. 16-18.)

While they were being fired on, Deputy Bicksler backed the BearCat up to the property's fence line to make sure everyone was okay and they checked the windshield damage by running their hands over the inside surface. The BearCat also received another volley of gunfire at some point. The men in the BearCat decided to put a ballistic shield that was in the BearCat over the windshield on the driver's side to help protect Deputy Bicksler. Sgt. Robbins got in the back seat to avoid being in front of the passenger windshield. The shield is designed for a person to hold in front to protect critical body areas and it has a horizontal window about 3" x 14" for the person to look through. With the shield laying on its side and covering the windshield, Deputy Bicksler was able to see through its small, now vertical, window to maneuver the BearCat. (Bicksler affidavit; TT, p. 216-220, 232; Bicksler depo, p. 20-24.)

Deputy Bicksler testified that they were told over the radio that Heathman was surrendering and he drove the BearCat back to the first location in front of the house. He

stayed in the driver's seat and the other deputies exited through the rear door. He saw Heathman come out the front door of the house and comply with orders to lower his clothing and do a 360° turn so he could be inspected for weapons. He was told to walk backwards towards the BearCat. (Bicksler affidavit; TT, p. 222, 226; Bicksler depo, p. 25.)

Deputy Bicksler saw Heathman pass by the driver's side window as he went to the rear of the BearCat, then he lost sight of him. He heard someone—he does not know who—yell, "stop resisting," "get off your hands," and "put your hands behind your back." Any actions occurred behind the BearCat and he was in the driver's seat and could not see them. His attention was primarily directed to the front of the house because it had not yet been searched for other shooters and the BearCat was not in a safe position. After Heathman was in custody, Deputy Bicksler drove him to the Tactical Command Post in the BearCat, then returned and drove around the house to make sure there were no other threats inside. There is no evidence that he witnessed any excessive force during the brief time he was driving to the command post. Deputy Bicksler had no physical contact with the Plaintiff and he did not see anyone punch, kick, knee, or strike him. (Bicksler affidavit; TT, p. 226, 233; Bicksler depo, p. 25-26.)

In his deposition, Heathman testified that Deputy Bicksler was in the BearCat driver's seat and did not touch him. (Doc. 61-1, p. 81.) No genuine issue of material fact exists on the excessive force issue regarding Deputy Bicksler. Summary judgment should be granted to him on this claim.

## B. SGT. ROBBINS: NO EXCESSIVE FORCE CLAIM

Sgt. Robbins' affidavit and deposition (pages 22-43) relate the encounter with Heathman on June 1, 2014. Sgt. Robbins was in the front passenger seat of the BearCat which was in position about 35-40 yards from the house. He was the SWAT extraction team leader and gave verbal commands to Heathman over the BearCat's intercom system, telling him to come out of the house. One of the purposes of the BearCat's position was to try to observe inside the house. Deputy Bicksler was driving the BearCat and Deputies Hoppel, Hay, and Boyles were in the back seat. (Robbins affidavit; Robbins depo, p. 4, 22-26.)

After a while, a female came out of the house, and was directed to come to the rear of the BearCat. There were two command posts. The closer one was the Tactical Command Post which was on the corner of the property where the incident occurred; the Mobile Command Center was further away—about 300 yards from the house at the intersection of two streets. The woman was secured with Sgt. Robbins' handcuffs and taken in the BearCat to the Tactical Command Post. She was then placed in a patrol car and other deputies drove her to the Mobile Command Center. (Robbins affidavit; Robbins depo, p. 23, 27.)

The BearCat was driven back to its position in front of the house, about 35-40 yards away. Mr. Heathman was not coming out of the house and they were instructed to prepare to use OC Gas and began putting on gas masks. Then, without warning, there was a large quantity of aggressive gunfire directed at the BearCat. Bullets struck the windshield in front of Deputy Bicksler and Sgt. Robbins, and the metal body portions of the vehicle. Sgt. Robbins ducked down to try to get below the level of the engine block. He gave orders for Deputy Bicksler to back up the BearCat, and they moved another 20-25 yards further away

from the house. After they did that, there was another volley of gunfire. They put a short hand-held ballistic shield made of kevlar on the windshield in front of the driver to try to protect him. (Robbins affidavit; Robbins depo, p. 30-31, 35, 37-39.)

Sgt. Robbins stated they were advised by the Mobile Command Center that Heathman said he was coming out of the house. Sgt. Robbins got back in the front seat and Deputy Bicksler drove the BearCat back up to their original location nearer to the house. The Plaintiff came out of the house. He had no shirt on, was wearing shorts, and had a can in one hand. He was also carrying what was later determined to be a cellphone. Over the intercom, Sgt. Robbins gave him orders to put the can on the ground, drop the other object he was holding, pull down his pants and turn around. This was so any obvious weapons could be seen. Heathman complied with the orders. There were concerns that other armed people might be inside the house and Sgt. Robbins and Deputies Hay, Boyles, and Hoppel exited from the rear of the BearCat so it could be used as a shield. Deputy Bicksler remained in the BearCat. (Robbins affidavit; Robbins depo, p. 40-42.)

The Plaintiff was told to walk backwards to the BearCat and he did so. Hay, Boyles, and Hoppel remained at the rear of the BearCat. Sgt. Robbins took a tactical position at the northwest corner of the vehicle so he could observe the front of the house and covered that side of the BearCat. Another SWAT team member was on the other side of the BearCat, also covering the area. Heathman went by Sgt. Robbins, walking backwards. As he walked by, he began speaking about the Constitution. As he got behind Sgt. Robbins at the rear of the vehicle, his continued statements discussing the Constitution gave the sergeant concern that the officers were losing verbal control of him.  Sgt. Robbins turned his head to look over his

shoulder and saw Deputy Hoppel grab the Plaintiff by the waist and bring him forward as if taking him to the ground. He then quickly turned back to watching the house, as he was in a dangerous position if a firefight developed. At some point, after Heathman walked to the rear of the BearCat, Sgt. Robbins, still maintaining his position of watching the house, heard someone commanding Heathman to "Get down, get down, get down.". (Robbins affidavit; Robbins depo, p. 41-43.)

Sgt. Robbins was told to loan his handcuffs to the deputies, but he had used them on the female taken into custody. He had to abandon his post and get some Ace bandages from the BearCat's first aid kit, which he used to secure Heathman's hands. Heathman was then picked up and placed face-down in the BearCat. Sgt. Robbins did not assist with that. Heathman was taken to the Tactical Command Post and placed in a patrol car to be transported to the Mobile Command Center. (Robbins affidavit; Robbins depo, p. 42-43.) There is no evidence that Sgt. Robbins witnessed any use of force in the BearCat during the brief ride to the Tactical Command Post.

The entire incident from the time Heathman walked backwards to the BearCat until he was placed inside took only a matter of seconds. Sgt. Robbins did not see any deputy strike, kick, punch, or use excessive force on the Plaintiff, either outside the BearCat or after he was placed in the BearCat. He did not observe any injuries to Heathman, including to his head. Heathman's face was turned away from Sgt. Robbins when he walked backwards to the rear of the BearCat, when he was on the ground being secured with the bandages, and when he was placed in the BearCat. (Robbins affidavit; Robbins depo, p. 42-43.)

In his deposition, Heathman testified that he does not think Sgt. Robbins struck him, that the sergeant was the one on the PA system giving him orders directing him towards the BearCat. The two deputies on the back of the BearCat were the ones who struck him. He believes those were Hoppel and either Boyles or Hay. (Doc. 61-1, p. 79-82.) No genuine issue of material fact exists on the excessive force issue regarding Sgt. Robbins. Summary judgment should be granted to him on this claim.

### C. NO FAILURE TO INTERVENE CLAIMS

The deposition, trial, and affidavit testimony of Deputy Bicksler and Sgt. Robbins support that they did not see any force used on the Plaintiff and so did not fail to intervene. An officer can be liable for failing to intervene when another officer uses excessive force. See Ensley v. Soper, 142 F.3d 1402, 1407-08 (11th Cir. 1998). None of these Defendants are conceding that excessive force was used when taking Heathman into custody, however, and that remains a claim he must prove. If no excessive force was used, there is no duty to intervene. See Crenshaw v. Lister, 556 F.3d 1283, 1293-94 (11th Cir. 2009). Furthermore, such liability only arises when the officer is in a position to intervene. Ensley, 142 F.3d at 1407. He must have a realistic opportunity to prevent the illegal conduct. Id. at 1407-08.

Heathman alleged in his deposition that he was struck by Hoppel and by Deputy Hay or Deputy Boyles. He also stated that the time from when he was first punched outside the BearCat to when he was thrown inside the vehicle was "probably 10, 15 seconds, maybe 20 seconds." (Doc. 61-1, p. 96.) Inside the BearCat, Heathman alleged that someone—he does not know who—put his knee on Heathman's face three to six times, and he is not sure how long that incident lasted. (Doc. 61-1, p. 68-70, 118.) However, the back doors of the BearCat

21

were never shut, and the inside incident lasted only long enough to back out the BearCat and transfer him to a patrol vehicle. (Doc. 61-1, p. 70.) Sgt. Robbins also testified that the time from Heathman walking backwards from the house to when he was placed inside the BearCat was only a matter of seconds.

Even if Deputy Bicksler or Sgt. Robbins had seen the Plaintiff being taken into custody outside the BearCat or observed force being used on him inside the vehicle, the alleged incidents occurred too rapidly to give either of them a realistic opportunity to intervene. See Brown v. City of Huntsville, 608 F.3d 724, 740 n.25 (11th Cir. 2010). Under that circumstance, the obligation to take steps to protect Heathman would not arise. See Riley v. Newton, 94 F.3d 632, 635 (11th Cir. 1996), cert. denied, 519 U.S. 1114, 117 S. Ct. 955 (1997).7 The Plaintiff must show the Defendants could anticipate and stop the show of excessive force. See Gomez v. Lozano, 839 F. Supp. 2d 1309, 1321 (S.D. Fla. 2012) (citing Hadley v. Gutierrez, 526 F. 3d 1324, 1331 (11th Cir. 2008).

In Gomez, the defendant officer was dealing with a hostile crowd when another officer tackled the plaintiff; the incident lasted only a few seconds, and the defendant was not even aware of the violence, so the only reasonable inference was that he could not intervene. Id. at 1322. This is similar to the instant case, in which the deputies had just undergone an aggressive firearms attack by the Plaintiff and it was unknown if more armed persons might be in the house.

Deputy Bicksler and Sgt. Robbins were focused on the house and the threat of another attack from that location during the vulnerable time when deputies were outside the BearCat and Heathman was being taken into custody. They were not at the rear of the vehicle

and did not see any use of excessive force. Sgt. Robbins' brief viewing of Hoppel taking down the Plaintiff would be a standard procedure in an arrest and not excessive. This is particularly true where Heathman was not being cooperative with the deputies, as Deputy Hay testified in the declaration filed with his Motion for Summary Judgment. (Doc. 61-2.) The ride after Heathman was put in the BearCat was likewise too short to provide any opportunity for an intervention if one was needed—the vehicle's back door was not even closed.

The Plaintiff has no evidence inferring that either of these deputies saw any force used or that they had an opportunity to intervene in the use of force if they had seen it. Presenting this issue to a jury would require improper speculation. Neither violated Heathman's constitutional rights and summary judgment should be granted in their favor.

## VIII. CONCLUSION

Each of these Defendants is entitled to qualified immunity and summary judgment should be entered for each of them. Sheriff Blair, Major Bibb, and Det. Dodd were not present at the incident location and did not see the Plaintiff being taken into custody. Under that circumstance, of course, they had no obligation to intervene in any use of force. The Plaintiff has not testified otherwise.

Deputy Bicksler and Sgt. Robbins were present at the scene, but each was focused on whether armed persons might still be in the house and were not watching as Heathman was taken into custody behind them at the rear of the BearCat. If they had been aware of the use of force and if it had been excessive, which they are not conceding, events occurred so quickly—20 seconds at the most—that there would have been no time for either to intervene.

The same is true if a use of force occurred once Heathman was placed inside the BearCat. The ride to the command center was brief and would not have provided any time for an intervention if one was needed.

Heathman has not stated that either of these deputies used any force on him as he was taken into custody, and he affirmatively said that Deputy Bicksler did not touch him and he does not believe that Sgt. Robbins did either. He testified that he believes the alleged force at the rear of the vehicle was applied by Hoppel and either Deputy Hay or Deputy Boyles. He does not know who allegedly applied force to his head as he was in the BearCat being driven to the command center. He has not supplied a reasonable inference that it was Sgt. Robbins, and the sergeant has affirmatively stated he did not use any force on the Plaintiff. No genuine issue of a material fact has been created.

None of these Defendants violated the Plaintiff's constitutional rights and no established law would have put them on notice that their actions did so. This is true because none of them participated in any use of force or observed any force that was excessive. Each is entitled to summary judgment in his individual capacity.

An official capacity claim against the Sheriff was insufficiently pled in the Complaint, but he would be entitled to summary judgment on such a claim.  No policy or custom of the Sheriff's Office was the moving force behind the alleged violation of the Plaintiff's rights. The Sheriff's Office had an official policy addressing the use of force, and no prior similar incidents are in evidence to indicate widespread abuse that would have put the Sheriff on notice of the need for a policy to prevent constitutional violations to which he was deliberately indifferent.

The Court is requested to enter summary judgment for Sheriff Blair, in his individual and official capacity, and for Major Bibb, Det. Dodd, Deputy Bicksler, and Sgt. Robbins, in their individual capacity.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on **April 22, 2016**, I electronically filed the foregoing with the Clerk of the Court using the CM/EMF system which will send notice of electronic filing to the following: Aaron v. Johnson, Attorney for Plaintiff; Bruce R. Bogan and Damon S. Starrett, Attorneys for Defendant, Cody Hoppel; Robert M. Stoler and Joel Mohorter, Attorneys for Defendant, Jeffrey Boyles; and Jason Vail, Attorney for Defendant, Roy Hay.  I further certify that I sent the foregoing document and the notice of electronic filing by U.S. Mail to the following non-CM/ECF participants:  N/A.

**/s/ Linda L. Winchenbach**
Florida Bar No. 0749249
John M. Green, Jr., P.A.
125 N.E. First Ave., Ste. 2
Ocala, Florida 34470
Tel: (352) 732-9252
Fax: (888) 545-7282
Lwinchenbach@me.com
Attorneys for Defendants, Chris Blair, as Sheriff of Marion County, Florida, Thomas Bibb, Michael Dodd, Ryan Robbins and Greg Bicksler